ASSOCIATED GENERAL CONTRACTORS OF SOUTH DAKOTA, INC., Highway–Heavy–Utilities Chapter, a South Dakota Corporation with its principal place of business in Pierre, South Dakota; South Dakota Trucking Association, a South Dakota Corporation with its principal place of business in Sioux Falls, South Dakota; Gregory B. Branaugh, Individually; D & G Concrete Construction, Inc., a South Dakota Corporation; Pat Tlustos, Individually; and Hills Materials Co., a South Dakota Corporation, Applicants,

v.

Ronald SCHREINER, duly Appointed Secretary of the Department of Revenue; Vern Larson, duly Elected Auditor; Homer Harding, duly Elected Treasurer of the State of South Dakota; Curt Johnson, duly Elected Commissioner of School and Public Lands; Richard L. Howard, duly Appointed Secretary of the Department of Transportation; the Department of Transportation; the Transportation Commission; Jay Swisher, Secretary of Department of Agriculture; Russell L. Stone, Director of the Division of Conservation of State Department of Agriculture; and the Conservation Commission, Respondents.

and

South Dakota Corn Growers Association, a South Dakota incorporated association; East River Electric, a South Dakota incorporated cooperative; South Dakota Association of Cooperatives, a South Dakota incorporated association; Broin Enterprises, a South Dakota corporation; Ethanol Producers Association, a South Dakota incorporated association; MG Oil, Inc., a South Dakota corporation; Ethanol Distributors, Inc., a South Dakota corporation; Viroment, a South Dakota corporation; Fuel Food Mart, Inc., a South Dakota corporation; South Dakota Farmers Union, a South Dakota incorporated association; South Dakota Farm Bureau, a South Dakota incorporated association; South Dakota Wheatgrowers Elevator Association, a South Dakota incorporated cooperative; Heartland Grain Fuels, L.P., a limited partnership; Agriculture Energy Servo Systems, a South Dakota corporation; American Coalition for Ethanol, an incorporated association; and South Dakota Association of Conservation Districts; South Dakota Wheat, Inc., a South Dakota corporation; and South Dakota Lakes and Streams Association, a South Dakota corporation, Intervenors and Respondents.

No. 17917.

Supreme Court of South Dakota.

Argued Aug. 4, 1992.

Decided Nov. 25, 1992.

Ronald G. Schmidt, Schmidt, Schroyer, Colwill and Moreno, Pierre, for applicants.

Mark Barnett, Atty. Gen., Pierre, for respondents.

Jeff Masten, Canton, and Jeffrey J. Fox, Sioux Falls, for intervenors except South Dakota Ass'n of Conservation Dist.

John L. Brown, Riter, Mayer, Hofer & Riter, Pierre, for intervenors South Dakota Ass'n of Conservation Districts; South Dakota Wheat; and South Dakota Lakes & Streams Ass'n.

WUEST, Justice.

AGC seeks a permanent writ of prohibition to prevent State from disbursing funds, claiming the statutes authorizing the expenditures are contrary to our State Constitution.

This is an original proceeding brought to this court under S.D. Const. art. V, § 5, the provisions of SDCL chs. 21–30 and SDCL 15–25–1.

Associated General Contractors and the Trucking Association (hereinafter AGC) filed a verified application for an alternative writ and permanent writ of prohibition contending both HB 1311, appropriating ethanol production payments, and HB 1009, creating ethanol tax credits, violate S.D. Const. art. XI, § 8 and art. XIII, §§ 1 and 2. AGC sought to prohibit Department of Revenue Secretary Ronald Schreiner, State Auditor Vern Larson and State Treasurer Homer Harding (hereinafter State) from expending state highway funds received from vehicle and fuel taxes for ethanol production payments and ethanol tax credits. AGC was granted an alternative writ of prohibition on April 27, 1992. State was given an opportunity to show cause why a permanent writ should not be issued.

On May 6, 1992, AGC filed a verified, amended, supplemental application expanding the list of state officials whose activities it sought to prohibit. AGC also augmented the list of challenged legislation to include SB 143, HB 1174, SB 204, and HB 1098. State filed a motion to quash and filed its verified answer to the application as amended and supplemented, denying any constitutional violations, and seeking dismissal of the application. An amended, supplemental alternative writ of prohibition was granted May 12, 1992.

South Dakota Corn Growers, et al., filed a motion to intervene on May 8, 1992, asking that the application for a permanent writ be denied and joining in the State's motion to quash. On May 15, 1992, Gregory B. Branaugh, D & G Concrete Construction, Inc., Pat Tlustos, and Hills Materials Co., applied to intervene as applicants. On May 19, 1992, a motion to intervene was filed on behalf of the South Dakota Association of Conservation Districts. All motions to intervene were granted.

## FACTS

The sixty-seventh session of the South Dakota Legislature, 1992, passed six bills which appropriated proceeds from the motor fuel tax for the purpose of subsidizing private ethanol producers and for other agricultural programs.

HB's 1311 and 1009 were enacted and approved as emergency measures by the Governor and became effective upon execution. SB 143, HB 1174, SB 204, and HB 1098 were enacted and approved by the Governor and became effective July 1, 1992.

### (1) *HB 1311*

This act creates the "Unclaimed Non-highway Agricultural Motor Fuel Tax Fund." It further provides that up to $80,-000, the amount which the legislature found represents the unclaimed tax refunds for fiscal year (FY) 1992, may be appropriated from the fund to the Department of Revenue to provide for ethanol production payments in April and May, 1992.

### (2) *HB 1009*

This act creates a tax credit program for producers of ethanol. A producer of etha-

nol may receive a credit, in the form of a transferrable motor fuel tax credit certificate, of twenty cents per gallon of ethanol. The credit is allowed only for ethanol produced in a South Dakota plant at which all fermentation, distillation, and dehydration takes place. Annual tax credits to one producer may not exceed the greater of $1,000,000 or an amount equal to $1,000,000 averaged over the last three years. Cumulatively, the incentive payments may not exceed five million dollars per year. The Secretary of Revenue is to adopt rules for the tax credit program. Producers must be licensed to be eligible to file for the credit. The credit may only be collected for the 120–month period following the producer's receipt of the first credit certificate.

(3) *SB 143*

This act appropriates money for the reconstruction of Lake Menno Dam. The act allocates $60,000 from the fund to the Commissioner of School and Public Lands in FY 1993 for the purpose of repairing Menno Dam. SB 143 directs the Secretary of Revenue to transfer $57,000 per month, for a period of ten months, into the unclaimed nonhighway agricultural motor fuel tax fund commencing July 1, 1992. Total transfers are not to exceed $570,000.

(4) *HB 1174*

This act appropriates $460,000 from the fund in FY 1993 to the Department of Transportation for public and special transportation grants. The grants are to assist South Dakota communities in meeting the match requirements of federally funded transportation programs.

(5) *SB 204*

This act appropriates $50,000 from the unclaimed nonhighway agricultural motor fuel tax fund in FY 1993 to the Department of Agriculture for the purpose of assisting

the Northern Crops Institute located in Fargo, North Dakota.

(6) *HB 1098*

This act clarifies the uses of taxes imposed on motor fuel not used to propel a motor vehicle on public highways. It creates the "Conservation Commission Grant Fund," and appropriates $850,000 to the fund in FY 1993 and an amount not to exceed $1,500,000 per year thereafter.

The legislature found that not all motor fuel taxes which qualify for the nonhighway motor fuel tax refund are, in fact, refunded under the procedure set forth in SDCL §§ 10–47A–46 to 10–47A–53, inclusive. The legislature determined that a certain amount of these unclaimed tax refunds from the sale of motor fuel for nonhighway uses should be utilized in a manner which benefits both agriculture and the citizens of the state by preserving South Dakota's natural resources. Thus, the legislature declared that an amount equal to 35%[1] of the claimed refunds, $80,000 in FY 1992, not to exceed $1,420,000 in FY 1993 and not to exceed $1,500,000 in any single fiscal year thereafter, represents the amount of unclaimed tax refunds from the sale of motor fuel for nonhighway uses. The legislature further declared that it is the policy of this state to use these funds to implement the conservation grant program.

The burden is on AGC to prove beyond a reasonable doubt the legislature acted beyond its constitutional authority.

> Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakenly shown and there is no reasonable doubt that it violates fundamental constitutional principles.
>
> *Independent Community Bankers Ass'n v. State*, 346 N.W.2d 737, 739 (S.D.1984);

---

**1.** The 35% figure was determined in advance of the legislative session by the Department of Transportation. This data was relied upon by the legislature in adopting HB 1098. It is this determination, that 35% of refunds from non-

highway agricultural uses go unclaimed, up to a fiscal year limit of $1.5 million, that underlies the various appropriations in HB 1311, HB 1098, SB 143, SB 204, and HB 1174.

*South Dakota Ass'n of Tobacco and Candy Distributors v. State*, 280 N.W.2d 662, 664–65 (S.D.1979).

### ISSUES

I.  Whether the transfer of unclaimed nonhighway motor fuel tax refunds to the unclaimed nonhighway agricultural motor fuel tax fund pursuant to HB 143 was an unconstitutional diversion of highway funds under art. XI, § 8 of the South Dakota Constitution.

II.  Whether the legislative determination that 35% of the motor fuel tax fund attributable to nonhighway use goes unrefunded based on an estimate, rather than fact, violates art. XI, § 8 of the South Dakota Constitution.

III.  Whether the ethanol incentive tax credit created by HB 1009 is an unconstitutional diversion of highway funds under art. XI, § 8 of the South Dakota Constitution.

IV.  Whether the ethanol production payments pursuant to HB 1311 and the appropriation to Northern Crops Institute in SB 204 constitute use of public funds for private purposes in violation of art. XI, § 2 of the South Dakota Constitution.

V.  Whether HB 1311 and SB 204 grant any special or exclusive privilege, immunity or franchise in violation of art. III, § 23 of the South Dakota Constitution.

VI.  Whether the legislature, in enacting the statutes at issue herein, lent or gave the State's credit to any association or corporation in violation of art. XIII, §§ 1 and 2 of the South Dakota Constitution.

### I.

Whether the transfer of unclaimed nonhighway agricultural motor fuel tax refunds to the unclaimed nonhighway agricultural motor fuel tax fund pursuant to SB 143 was an unconstitutional diversion

of highway funds under art. XI, § 8 of the South Dakota Constitution.

■ AGC claims that the legislative creation of the unclaimed nonhighway agricultural motor fuel tax fund violates the portion of art. XI, § 8 of the South Dakota Constitution, which addresses use of gasoline excise taxes for highway purposes:

> No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which the tax only shall be applied, and the proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highways in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel except costs of administration and *except the tax imposed upon gasoline or other liquid motor fuel not used to propel a motor vehicle over or upon public highways of this state* shall be used exclusively for the maintenance, construction and supervision of highways and bridges of this state.  (Emphasis added.)

S.D. Const. art. XI, § 8.

AGC argues that the constitution requires the unclaimed tax refunds go into the state highway fund where they must be used to finance the maintenance, construction and supervision of the highways and bridges of this state.

State first argues that AGC has failed to meet the heavy burden imposed upon those who challenge the constitutionality of a state statute. *See Independent Community Bankers Ass'n; Tobacco and Candy Distributors.*  State further argues that the "highway purpose" restriction found in art. XI, § 8, does not apply to gasoline taxes imposed on gasoline *not used* to propel vehicles on or over the state's public highways.  State acknowledges legislative attempts to utilize the gasoline excise tax for purposes other than "the maintenance, construction and supervision of highways and bridges" have been unsuccessful.  *See*

*South Dakota Automobile Club v. Volk,* 305 N.W.2d 693 (S.D.1981); *Opinion of the Supreme Court,* 257 N.W.2d 442 (S.D. 1977); *State ex rel. Parker v. Youngquist,* 69 S.D. 423, 11 N.W.2d 84 (1943).

AGC has failed to overcome the heavy burden of showing beyond a reasonable doubt that the legislature's action was in violation of the constitution.

The tax proceeds at issue herein are those collected for "nonhighway agricultural use," defined as "the use of fuel off of public highways for agricultural purposes." SDCL 10-47A-1(22). Those motor fuel taxes are refundable pursuant to the provisions of SDCL 10-47A-46, which provides in part:

> Any person, municipal or private corporation or political subdivision of the state may apply for and *obtain a refund of motor fuel taxes imposed and paid* under the provisions of §§ 10-47A-39 to 10-47A-53, inclusive, for fuel purchased and used in motor vehicles, recreation vehicles and farm equipment *used for nonhighway agricultural purposes;* or used in vehicles or equipment for a *nonhighway commercial* use, all as defined under §§ 10-47A-1 to 10-47A-37, inclusive. (Emphasis added.)

These monies are refundable because they are not derived from an excise tax on fuel used on the public highways. These funds arise from a "tax imposed upon gasoline ... not used to propel a motor vehicle over or upon public highways of this state[.]" S.D. Const. art. XI, § 8. In short, these are tax receipts included within the exception language of art. XI, § 8.

It is true that in the past the unclaimed refunds arising from nonhighway uses went into the state highway fund pursuant to SDCL 10-47A-11, which provided in part:

> At the beginning of each month, the secretary shall make adjustments to the motor fuel tax fund balance in the following manner:
>
> ....

(5) Transfer the remaining cash balance to the state highway fund.

However, the constitution does not mandate such a transfer. The legislature amended the above provision of SDCL 10-47A-11(5) in HB 1098. The legislature's action was constitutional as it concerned funds covered by the exception in art. XI, § 8 of the South Dakota Constitution.

**II.**

Whether the legislative determination that 35% of the motor fuel tax fund attributable to nonhighway use goes unrefunded based on an estimate, rather than fact, violates art. XI, § 8 of the South Dakota Constitution.

■ AGC argues the legislative determination, based on educated guesswork, that 35% of the motor fuel tax fund attributable to nonhighway uses goes unrefunded, is contrary to the intent of the people who adopted the amendment and thus, violates art. XI, § 8. This argument is based on the underscored language in art. XI, § 8, which states:

> No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which the tax only shall be applied, *and the proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highways in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel except costs of administration and except the tax imposed upon gasoline or other liquid motor fuel not used to propel a motor vehicle over or upon public highways of this state shall be used exclusively for the maintenance, construction and supervision of highways and bridges of this state.* (Emphasis added.)

S.D. Const. art. XI, § 8.

AGC argues that the legislature's determination was based "on assumptions and estimates as opposed to fact."

State contends that AGC's argument invites the court to intrude into matters left to the legislature. "[T]he courts should not override the legislature's conclusion if it can be supported on any reasonable ground." *State v. Smith,* 88 S.D. 76, 81, 216 N.W.2d 149, 152 (1974).

AGC's argument ignores the plain language of the exception clause in art. XI § 8. "[W]e have the right to construe our state constitutional provision in accordance with what we conceive to be its plain meaning." *State v. Opperman,* 247 N.W.2d 673, 674–75 (S.D.1976). We find the language indicates the people who ratified the constitutional amendment intended that taxes on fuel not used to propel vehicles on the state highways was excepted from the state highway fund. Further, AGC has failed to show beyond a reasonable doubt that the legislative determination of the unclaimed percentage is unconstitutional. *Independent Community Bankers Ass'n; Tobacco and Candy Distributors.*

### III.

Whether the ethanol incentive tax credit created by HB 1009 is an unconstitutional diversion of highway funds under art. XI, § 8 of the South Dakota Constitution.

■  AGC argues the incentive tax credit created by HB 1009 unconstitutionally diverts highway funds contrary to the language of art. XI, § 8, which requires certain tax proceeds to be used exclusively for highway purposes. The pertinent constitutional language is underscored below:

No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which the tax only shall be applied, and the proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highways in this state and *the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel* except costs of administration and except the tax im-

posed upon gasoline or other liquid motor fuel not used to propel a motor vehicle over or upon public highways of this state *shall be used exclusively for the maintenance, construction and supervision of highways and bridges of this state.* (Emphasis added).

S.D. Const. art. XI, § 8.

State agrees that once a gasoline excise tax which is constitutionally dedicated to the exclusive use for highway purposes is levied and collected, it may not be diverted to other uses. *See Volk; Youngquist.* State argues, however, that the effect of the tax credit is to prevent the "proceeds" from ever coming into existence.

Clearly, the legislature has the power to disburse public revenues for any lawful purpose. "There is no doubt about the right of the legislature to appropriate the proceeds of a revenue law to any lawful purpose, or to place the proceeds in the general fund." *Youngquist,* 69 S.D. at 429, 11 N.W.2d at 87 (citing *Opinion of the Judges,* 50 S.D. 324, 326, 210 N.W. 186, 187 (1926)). This power, however, is not unlimited:

The history of Article XI, § 8 of our Constitution ... and the cases of the South Dakota Supreme Court since the enactment of that constitutional provision, clearly indicates that this is a restricted and impressed fund created by the Constitution that prevents the use of the funds described in the Article for payment of any obligation of the state other than those described in the article.

*Opinion of the Supreme Court,* 257 N.W.2d at 445.

■  State argues the ethanol tax credit does not violate the constitution as the prohibition applies only to proceeds and because the credit is applied against tax liability before collection, there are no tax proceeds. This constrained reading of one clause of art. XI, § 8 will not stand. "A Constitutional provision, like a statute, must be read giving full effect to all of its parts." *South Dakota Bd. of Regents v.*

*Meierhenry,* 351 N.W.2d 450, 452 (S.D. 1984). The court, in construing a constitutional provision, must have regard to the whole instrument, and must seek to harmonize the various provisions, and if possible, give effect to all of them. *Haggart v. Alton,* 29 S.D. 509, 526, 137 N.W. 372, 375 (1912).

The first clause of art. XI, § 8 refers to the levy of fuel taxes while the second clause refers to the proceeds of fuel taxes; the clauses are to be read together. This court, in interpreting the provisions of art. XI, § 8 and § 2 together, stated the first clause of art. XI, § 8, "does prevent the diversion of taxes which have been levied or collected, or which are already on hand and appropriated to other purposes." *Youngquist,* 69 S.D. at 431, 11 N.W.2d at 87. "The word 'levy', as applied to taxation, is a legislative act, whether state or local, which determines that a tax shall be laid, and fixes its amount." *Olson v. Oklahoma Tax Commission,* 198 Okl. 607, 608, 180 P.2d 622, 624 (1947). The second clause of art. XI, § 8 limits the use of revenue derived from the taxes levied on motor fuel used in vehicles on the public highways. Art. XI, § 8, read in its entirety, prevents the diversion of taxes on fuel used to propel motor vehicles over or upon the public highways of this state from the time the legislature determines motor vehicle fuel will be taxed.

The legislature, in issuing credits which may be claimed against a restricted fund, is attempting to do indirectly what it is forbidden to do directly. The United States Supreme Court found an attempt by Congress to tax foreign bills of lading violated U.S. Const. art. I, § 9 which prohibits tax or duty on articles exported from the states. *Fairbank v. United States,* 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901). In reaching that holding, the court stated, "In other words, that decision affirms the great principle that what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same re-

sult." *Id.* 181 U.S. at 294, 21 S.Ct. at 653, 45 L.Ed. at 867. The legislature is not allowed to directly appropriate the proceeds of the motor vehicle fuel tax for any use other than the maintenance, construction and supervision of highways and bridges. The legislature, through the use of tax credits applied before collection, is attempting to indirectly divert tax proceeds dedicated to the maintenance, construction and supervision of highways and bridges. What the legislature is forbidden to do directly by the constitution it cannot do indirectly. HB 1009 is an unconstitutional diversion of dedicated tax proceeds under S.D. Const. art. XI, § 8.

## IV.

Whether ethanol production payments pursuant to HB 1311, and the appropriation found in SB 204 constitute an invalid use of public funds for private purposes in violation of art. XI, § 2 of the South Dakota Constitution.

■ AGC argues HB 1311 and SB 204 improperly use public funds for private (rather than public) benefit, contrary to art. XI, § 2 of the state constitution, which provides in pertinent part: "Taxes shall be uniform on all property of the same class, and shall be levied and collected for public purposes only."

State argues the use of unclaimed non-highway agricultural motor fuel tax refunds to promote the ethanol industry is a valid public purpose, even though private individuals may incidentally benefit. Further, State asserts that whether a purpose is public is for the legislature to determine and the legislature's determination is entitled to great weight before the courts.

> Determining whether a statutory purpose is public or private is pretty much a matter of policy and wisdom for the legislature. In making such decision it is vested with a large discretion with which the courts should not interfere unless its action is clearly evasive.

*Clem v. City of Yankton,* 83 S.D. 386, 396, 160 N.W.2d 125, 131 (1968).

This court has found the following to be examples of a public use of public funds: *Clem*, (cities issuing bonds to provide facilities for private business to promote economic development); *Torigian v. Saunders*, 77 S.D. 610, 97 N.W.2d 586 (1959) (butter tax to be used to promote the dairy industry); *Wheelon v. South Dakota Land Settlement Bd.*, 43 S.D. 551, 181 N.W. 359 (1921) (issuing of bonds by the State to loan money to settlers of agricultural property).

Here the court is concerned with the power of the legislature to adopt HB 1311; not the wisdom of the action. *Clem*, 83 S.D. at 397, 160 N.W.2d at 131. The importance of agriculture to the general welfare of South Dakota has been recognized by this court. *Wheelon*, 43 S.D. at 559, 181 N.W. at 361. Here, the legislature could reasonably conclude that legislation to encourage production and export of ethanol made from corn will achieve the purpose of promoting agriculture in South Dakota.

The Northern Crops Institute is a council which promotes technical and marketing assistance to producers of northern crops. The South Dakota Wheat Commission, an agency of the State of South Dakota, is a member of the Institute's policy board. Although funding to an out-of-state institute is more attenuated than appropriations within the state, the legislature could still reasonably conclude the act served the public purpose of promoting agriculture in this state.

Further, AGC has not carried the burden of showing the legislature's actions were "clearly evasive." *Clem*, 83 S.D. at 396–97, 160 N.W.2d at 131. HB 1311 and SB 204 do not violate the constitutional provision prohibiting use of public funds for private purposes.

V.

Whether HB 1311 and SB 204 grant any special or exclusive privilege, immunity or franchise in violation of art. III, § 23 of the South Dakota Constitution.

■ AGC argues HB 1311 and SB 204 grant special or exclusive privileges to indi-

viduals, associations, or corporations in violation of art. III, § 23(9), which provides in part:

> The Legislature is prohibited from enacting any private or special laws in the following cases:
>
> . . . .
>
> (9) Granting to an individual, association or corporation any special or exclusive privilege, immunity or franchise whatever.

S.D. Const. art. III, § 23(9).

In *Behrns*, this court held:

> Article III, § 23, is a prohibition against special or private laws when a general law is applicable. A legislature has successfully avoided this prohibition when a statute is "so framed in good faith that by its terms it should apply to all parts of the state and operate on all members of the class when they come within the scope and purpose of the enactment ...;" Generally, a legislature may define any class it wishes, and so long as all members of that class are treated alike the prohibition against private or special laws is not violated[.]

*Behrns v. Burke*, 89 S.D. 96, 99, 229 N.W.2d 86, 87 (1975).

HB 1311 is not a special law but a general law in which all ethanol producers within the class created are treated uniformly. All ethanol producers who can meet the criteria are eligible to receive ethanol production payments. Thus, the ethanol production payments do not violate art. III, § 23 of the South Dakota Constitution.

■ HB 204, appropriating $50,000 to the Northern Crops Institute, does not create a class; it is closer to a private benefit. However, even a private benefit may be constitutional if it meets certain criteria. This court has held:

> Although it is readily apparent that the franchises described under SDCL 49–34A–42 are exclusive, exclusivity is not in itself prohibited by art. III, § 23. The grant of special or exclusive privileges

for private benefit is within the prohibition of the constitution. Grants of special or exclusive privileges, even those that are essentially monopolistic in character, are not, however, forbidden, where the primary purpose of the grant is the promotion of the public interest and not the private benefit of the grantees.... The courts should not override that legislative conclusion if it can be supported on any reasonable ground.

*Matter of Certain Territorial Electric Boundaries,* 281 N.W.2d 65, 70 (S.D.1979).

If the challenged statute promotes the public interest, even though it also confers a private benefit, it does not violate art. III, § 23(9). We have already decided that HB 204 does serve a public purpose. Therefore, even though there is private benefit, the public purpose of HB 204 saves it from violating art. III, § 23(9).

## VI.

Whether the legislature in enacting the statutes at issue herein lent or gave the State's credit to any association or corporation in violation of art. XIII, §§ 1 and 2 of the South Dakota Constitution.

■ AGC asserts the disputed legislation violates art. XIII, §§ 1, 2 because it constitutes the lending or giving of the State's credit to or in aid of an association or corporation not regulated and controlled by the State.

S.D. Const. art. XIII, § 1, provides in part:

For the purpose of developing the resources and improving the economic facilities of South Dakota, the state may engage in works of internal improvement, may own and conduct proper business enterprises, may loan or give its credit to, or in aid of, any association, or corporation, organized for such purposes. But any such association or corporation shall be subject to regulation and control by the state as may be provided by law.

State argues that the legislation at issue cannot be construed as constituting a state loan and the State has not given its credit to any of the entities or projects in the form of a guarantee.

The language "loan or give its credit to" in art. XIII, § 1 has been interpreted to refer to the loaning or borrowing of money secured by the State:

These legislative acts by their terms purport to provide for the establishment and maintenance of a system of rural credits for the loaning of money by the state ...; authorizing the state to borrow money on its warrants and bonds, secured by the good faith and credit of the state[.]

*Schaaf v. South Dakota Rural Credit Bd.,* 39 S.D. 377, 382, 164 N.W. 964 (1917). The appropriations contained in HB 1098, HB 1009, HB 1311, HB 1174 and SB 204 are not loans; there is no requirement of repayment expressed or implied in any of appropriations made by the acts. Art. XIII, § 1 does not apply to the challenged legislation.

S.D. Const. art. XIII, § 2, provides in part:

For the purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate one hundred thousand dollars[.]

This court determined in 1895 that debt does not include appropriations satisfied out of current revenues or those revenues in the process of collection. In *In re State Warrants,* 6 S.D. 518, 521, 62 N.W. 101, 103 (1895) we stated:

By general law the legislature has provided for the levy of an annual tax for meeting the ordinary expenses of the state. By so providing, in a constitutional manner, for the levy of a sufficient tax, it has provided a revenue, to the extent of the tax for the payment of the ordinary or current expenses of the state. It may then make appropriation of such revenue for diverse and specific

purposes ... without incurring an indebtedness therefore, within the meaning of said section 2, art. 13 of the constitution.

Here, each appropriation in the challenged legislation is funded in the fiscal year the money is generated. There is no debt created in HB 1098, HB 1311, HB 1174, SB 143, or SB 204 which violates art. XIII, § 2 of the South Dakota Constitution.

HB 1009, where credits might be applied against tax liability incurred in a different fiscal year, might not fit within our definition of what is excluded as a debt under art. XIII, § 2. As we have held HB 1009 unconstitutional on other grounds, we do not reach this issue.

In conclusion, we uphold the constitutionality of all the challenged statutes, except HB 1009 which we declare to be unconstitutional and grant a permanent writ against State from complying with the provisions of HB 1009.

MILLER, C.J., and AMUNDSON, J., concur.

HENDERSON and SABERS, JJ., concur in part and dissent in part.

HENDERSON, Justice (concurring in part; dissenting in part).

In my opinion, this is a clever raid upon the state treasury.* It is a series of bills, lobbied through the State Legislature, which attempts to overcome the constitutional provisions in our state. These unconstitutional bills favor a single private industry, the ethanol producers, by appropriating tax dollars to them. Ethanol producers are but one segment of South Dakota's private enterprise system. To subsidize them directly by state law, runs afoul of Art. XI, § 2 of the State Constitution: *"Taxes ... shall be levied and collected for public purposes only."* (Emphasis

supplied mine). HB 1009 furnishes up to $5 million per year of *credit to private ethanol producers.* It is a monumental discrimination against the taxpayers of this state.

Basically, Art. XI, § 8 states that the fuel used to propel motor vehicles over or upon public highways in South Dakota is subject to taxation for improving highways and bridges. If the fuel is not used for that purpose, then it is not subject to this tax. The problem is that the tax is collected on certain fuels that are used in both highway and nonhighway use vehicles. To keep in line with the constitution, the Legislature created a system whereby people who have used the fuel for nonhighway use, but were required to pay the tax at the point of purchase, may receive a refund for essentially paying a tax they were not required to pay. SDCL 10–47A–46. Apparently, charging the tax to all, and then refunding the tax to those completing the nonhighway use affidavit, is a better method than having the fuel seller make the determination. Otherwise, each motor fuel seller would have to be responsible for differentiating the tax burden of customers. In the end, the Legislature estimates that 35% of the refunds are never collected.

Thus, the tax is initially collected for the sole purpose of benefitting highways and bridges. Citing the exception language in Art. XI, § 8, the State wants to divert this 35% to other areas not connected to benefitting highways and bridges. This 35% figure by declaration of HB 1098, is based upon "assumptions" and "estimates." *It is not a fact.* All persons paying motor fuel tax for non-highway agricultural uses are entitled to a full refund pursuant to SDCL 10–47A–46. The refund claim must be made under oath pursuant to SDCL 10–47A–48. The claim is subject to audit pursuant to SDCL 10–47A–51. HB 1098 is based on the assumption that not all per-

---

* Intervenor's brief advocates that "the tax is never collected by the State, and appropriation out of the Highway Trust Fund never happens." False. The motor fuel tax is collected at the

pump by agents of the state; at this moment, the tax becomes dedicated by the State Constitution.

sons who are entitled to do so claim their motor fuel tax refunds, at least to the extent of 35%. Quantification for this assumption is sadly lacking. The State adopts federal statistics as to how much gasoline may have been purchased for agricultural use in South Dakota. The next assumption is that 50% of such gasoline is used on the highways and 50% is used off the highways by the agricultural purchasers. It is then estimated that approximately $1.5 million of motor fuel tax, for which entitlements to refunds exist go unclaimed. The federal statistics utilized were for the year 1987. Based on certain assumptions, an average cost of 93¢ per gallon in 1987 is utilized for the calculations.

The *average* actual refunds for non-highway agricultural use over the last four years is approximately $4.2 million. It is ultimately determined that the estimated unclaimed non-highway agricultural refunds constitutes approximately 35% on average of the actual refunds. Lost in these estimates is the right of the taxpayers to claim their rightful refund. Neither the framers of the 1940 amendment, nor the electorate, could have intended or contemplated that the Legislature would declare some arbitrary percentage of the highway fund as "unclaimed non-highway agricultural refunds."

In simpler terms, the State levied a tax for purpose X. Some taxpayers were entitled to a refund from the proceeds collected pursuant to purpose X. However, not all so-entitled taxpayers collected their refund. The Legislature now assumes these unclaimed refunds are free from purpose X and can be allocated elsewhere. Wrong. These funds were collected for purpose X. The test, as the history of the 1940 amendment indicates, is to focus on why the tax was levied.

Initially, the motor fuel tax is collected pursuant to the 1940 amendment. The funds that became unclaimed refunds were also collected under the same amendment. Therefore, the State is left with two uses for the funds collected under this mandate of the people: To benefit highways and bridges *or* refund the proceeds to those people who were exempt from the tax. Nowhere does this amendment give the Legislature the right to take money collected for one purpose and transfer it to another. Furthermore, the funds are presumed to be from fuel sold for highway use vehicles until a taxpayer follows the proper channels to receive a refund. The Legislature cannot presume otherwise. The key is why was the tax levied, not why it became exempt.

The Legislature cannot skirt around the purpose constitutionally mandated for collecting the tax. This Court has held that we should give effect to the intent of the framers of the people who adopted a constitutional provision. *State ex rel. Payne v. Reeves*, 44 S.D. 568, 184 N.W. 993 (1921). A holding followed that words in a constitutional amendment must be construed in the sense most obvious to the common understanding of the people at the time of ratification or adoption. *State ex rel. Oster v. Jorgenson*, 81 S.D. 447, 136 N.W.2d 870 (1965); *accord: State ex rel. Mills v. Wilder*, 73 S.D. 330, 42 N.W.2d 891 (1950). Over sixty years ago, when the Legislature attempted a similar re-appropriation of motor fuel taxes, this Court stated:

[W]e are of the opinion that monies now on hand or hereafter to be received as the result of payment of taxes whether motor fuel tax or other tax already levied, and the proceeds of which have already been appropriated, must be applied to the purposes for which they were levied and to which they have already been appropriated, and we think the same could not now be diverted, even by legislative action, to any other purpose.

*In re Opinion of the Judges*, 59 S.D. 469, 240 N.W. 600 (1932); *In re Opinion of the Judges*, 50 S.D. 324, 210 N.W. 186 (1926); *White Eagle Oil & Refining Co. v. Gunderson*, 48 S.D. 608, 205 N.W. 614 (1925). Other cases followed wherein this Court emphatically denied legislative encroachment upon the Highway Trust Fund:

*South Dakota Automobile Club, Inc. v. Volk,* 305 N.W.2d 693 (S.D.1981); *In re Opinion of the Supreme Court,* 257 N.W.2d 442 (S.D.1977); *Northern Improvement Co. v. S.D. State Highway Comm.,* 87 S.D. 71, 202 N.W.2d 861 (1972); *G.H. Lindekugel & Sons, Inc. v. S.D. State Highway Commission,* 87 S.D. 32, 202 N.W.2d 125 (1972); *State ex rel. Mills v. Wilder, supra; State ex rel. Parker v. Youngquist,* 69 S.D. 423, 11 N.W.2d 84 (1943). *Parker, Volk,* and the 1977 *Opinion* case were all attempts to transfer a percentage of the highway fund and each attempt was rejected.

The majority states: "The·tax proceeds at issue herein are those collected for 'nonhighway agricultural use,' defined as 'the use of fuel off of public highways for agricultural purposes.'" This is not accurate. The tax was collected for "maintenance, construction and supervision of highways and bridges of this state." However, if the purchaser used this same taxed fuel for nonhighway purposes, that·purchaser was entitled to a refund under SDCL §§ 10–47A–46, 10–47A–47, and 10–47A–48. In other words, if the money does not go for highways and bridges, it must be returned to the taxpayers. If the State takes the position that these unclaimed funds can be used elsewhere, then the State has, in fact, collected taxes without a purpose. Said another way, without an object.

Under Art. XI, § 8, taxes may be applied only to the object for which they were levied. If the object of a levy is completed or can no longer be used, only then may these funds be diverted to any public purpose. *Douglas Ind. Sch. Dist. No. 3 v. Bell,* 272 N.W.2d 825 (S.D.1978). The sole and exclusive object of the tax in question is to benefit highways and bridges. However, due to the collection method utilized, the State apparently collected more revenue than it should have collected, via unclaimed refunds. Possession of these unclaimed earmarked funds does not grant the State a license to divert funds unrelated to their collected purpose. If the etha-

nol entrepreneurs now, where does this end? Who is next? Where is the ending of such a beginning? Justification of various pet projects would be birthed in the minds of the watchful eye over this proceeding. This money was collected under the authority of the motor fuel tax to benefit highways and bridges. This Court, as well as the Legislature, should look to the purpose as to why the tax was collected.

Again and again in its briefing to this Court, the State focuses on the exception clause. Under this logic, then the tax, from the beginning, was collected in violation of the constitution for it was collected without a purpose. It was collected under the guise of benefitting the highways and bridges, a purpose, under the State's theory, that would not attend. Thus, it could be reasoned that the tax should never have been collected. Regardless, this Court should judge the constitutionality of the tax appropriations under its definition or purpose before determining whether it falls within an exception. *Parker, supra; Schomer v. Scott,* 65 S.D. 353, 274 N.W. 556 (1937); *Opinion of the Judges,* 240 N.W. at 602; *Opinion of the Judges,* 210 N.W. at 186; *White Eagle Oil, supra.* The exception language does not create a back door to reallocate funds that were collected for a specific purpose. These funds were collected "exclusively for the maintenance, construction and supervision of highways and bridges of this state." If the monies are not refunded, then they should be utilized for the purpose for which they were collected.

I concur with the majority holding that HB 1009 is an unconstitutional diversion of tax proceeds. In point of fact, this enactment authorizes a diversion of up to $5 million dollars a year. HB 1009 provides *a subsidy to private producers of ethanol of 20¢ per gallon of ethanol produced in South Dakota.* As I read the limited record, it is suggested that as of May, 1992, there were two plants in extreme eastern South Dakota and two "program participants" desiring to construct facilities and

to attract investors. Were these tax credits effectuated, these businesses would secure a windfall of gigantic financial proportion. Yet, I must go one step further and state that all six laws challenged, for the reasons cited, are fruits of the same unconstitutional application of Art. XI, § 8.

Nevertheless, I still address the constitutionality of the issue of whether public funds can be appropriated for private purposes. The majority correctly notes the presumption of constitutionality lies with the Legislature while the heavy burden is upon the challenger. Thus, we look to Art. XIII, § 1, which states in pertinent part:

> For the purpose of developing the resources and improving the economic facilities of South Dakota, the state may ... loan or give its credit to, or in aid of, any association, or corporation ... [But] shall be subject to regulation and control by the state as may be provided by law ...

The Legislature has broad discretion in defining a public purpose. *Clem v. City of Yankton,* 83 S.D. 386, 160 N.W.2d 125 (1968). The wisdom of its decision is a matter of legislative policy, not of judicial discretion. *Torigian v. Saunders,* 77 S.D. 610, 97 N.W.2d 586 (1959). However, the promotion of the interests of individuals, although it may result in the advancement of the public welfare, is a private, not a public, object. An incidental advantage to the public which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public funds raised through taxation. *Opinion of the Judges,* 240 N.W. at 602. These credits have nothing to do with either the purchase or consumption of motor fuel by the ethanol producers. It is a pure subsidy. Although the Legislature is generally left with the task of drawing the line between public and private purpose, this is not a carte blanche power.

Under Art. III, § 23(9), the Legislature is prohibited from enacting laws which grant special or exclusive privileges, immunities or franchise to individuals, associations or corporations *whatever.* Precisely, the State Legislature, through this scheme of statutes, accomplished the very purpose which it was forbidden to do. Furthermore, this Court can interfere with the legislative determination of public policy if its actions are "clearly evasive." *Clem, supra.* For an appropriation of public money to be constitutional, the use must directly or indirectly materially aid in the proper functioning of some *governmental agency. Mackey v. Reeves,* 42 S.D. 340, 175 N.W. 359 (1919). Perhaps the holding of *Mackey* may have been too broad. I fear that any purpose may (indirectly) materially aid some agency. Our State Legislature is unquestionably given a lot of rope to determine "public good," but this time they roped the wrong critter. Not only have a handful of various South Dakota businesses reaped the rewards of free money, but the Legislature had the audacity to allocate funds to interests outside this State as well. The State might as well send tax dollars to the Far East so that manufacturers can improve the technology of passenger safety in vehicles imported to car dealers in Watertown. Public good, you see, under the same theory.

At the turn of the century, the brethren of the Michigan high court wisely evaluated the fine line between public and private purpose.

> But it is not the business of the state to make discriminations in favor of one class against another, or in favor of one employment against another. *The state can have no favorites. Its business is to protect the industry of all, and to give all the benefit of equal laws. It cannot compel an unwilling minority to submit to taxation in order that it may keep upon its feet any business that cannot stand alone.* Moreover, it is not a weak interest only that can give plausible reasons for public aid.... we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the

weaker will be taxed to enhance the profits of the stronger. [We] shall not question the right of the people, by their constitution, to open the door to such discriminations; but in this state they have not adopted that policy, and they have not authorized any department of the government to adopt it for them. (Emphasis supplied mine).

*Michigan Sugar Co. v. Auditor General,* 124 Mich. 674, 83 N.W. 625, 628 (1900), *writ of error dismissed,* 185 U.S. 112, 22 S.Ct. 581, 46 L.Ed. 829 (1901). Although state funds have in the past subsidized private industries under the public purpose doctrine, this is not an automatic right.

> Taxation for private purposes is no more legal than robbery for private purposes. *And where an enterprise is conducted by private persons for their own private benefit the public authorities have no control over the expenditure, and no share in the profits ... No enterprise can properly be regarded as a public enterprise in which the public has no voice.* For the expenditure of public money the constitution and laws provide public officers, and put them under adequate control and security. The money of the people belongs in the custody of the agents of the people. Governments cannot delegate public responsibilities to private and irresponsible hands. (Emphasis supplied mine).

*Id.* This Court should take heed of these words. As an example, the Northern Crops Institute in Fargo, North Dakota, is a private crop institute and the taxpayers of this state, who have paid money into the Highway Trust Fund, owe no responsibility to financially shore it up. "Equal laws" were not passed in this package.

Finally, I wish to state that in 1990, our same Governor asked this Court if the State could become a part owner of an agricultural processing facility. We held:

(1) State may not appropriate money to buy, construct, and operate corn wet-milling plant; (2) State may not become part owner of agricultural processing fa-

cility; (3) State may not acquire equity position in agricultural processing facility; and (4) State may not incur indebtedness to finance privately owned agricultural processing facility.

*Matter of Advisory Opinion,* 456 N.W.2d 546 (S.D.1990). We reached this holding by applying the following 4–part test:

1. the enterprise must be for the purpose of developing the resources and improving the economic facilities of the State;

2. no money of the State is to be appropriated or any indebtedness incurred for the enterprise unless approved by a two-thirds vote of each branch of the Legislature;

3. the indebtedness of the State for Article XIII, § 1 purposes must remain within the stated limit; and

4. the enterprise must be "proper" for the State to conduct.

*Id.* at 548. Under this test, the State must maintain control. We expressed:

> [T]he limitations of Article XIII, § 1 concerning regulation and control would apply because in developing the state's resources, the state is incurring indebtedness to finance a *privately-owned* agricultural processing facility. It is our conclusion that the requirement that "any such association or corporation shall be subject to regulation and control by the state as may be provided by law" implies more regulation and control than a private corporation is subject to under the South Dakota Business Corporation Act. SDCL Title 47. Being subject to regulation and control by the state as may be provided by law is inconsistent with being a "privately-owned" agricultural processing facility.

*Id.* at 550. As our Constitution, our case law, and the advice from Michigan suggest, the first hurdle for public funding of private concerns is subjecting the recipient to regulation and control by the State. To further safeguard our lawmakers from the error of funding private industry "in

sheep's clothing," the above 4–part test should also apply. However, I hasten to point out that HB 1311 and SB 204 never reach this test because they stumble before the first hurdle and are therefore unconstitutional.

Having fully treated HB 1009 (subsidy to ethanol producers), HB 1311 (ethanol production credits), and SB 204 (Northern Crops Institute in Fargo, North Dakota), I would also hold that:

1. HB 1098 for conservation commission grant programming;

2. SB 143 for Lake Menno Dam reconstruction; and

3. HB 1174 for transportation assistance funding

are all entities under control of the State. It is not within my prerogative to express that these appropriations are wise—that decision lies within the wisdom of our State Legislature. However, any funding for these projects must emanate from the general funds of this State and not from these dedicated funds. Though the presumption of constitutionality lies with the Legislature, AGC has met the burden of refuting the presumption. *In the Matter of Application No. 5189–3 to Extend Time,* 467 N.W.2d 907 (S.D.1991).

Therefore, I concur in part and dissent in part.

SABERS, Justice (concurring in part and dissenting in part).

I agree with the majority on Issue II that "AGC has failed to show beyond a reasonable doubt that the legislative determination of the unclaimed percentage is unconstitutional," citing *Smith,* 216 N.W.2d 149. In other words, the legislative determination that 35% of the motor fuel tax fund

attributable to nonhighway uses goes unrefunded *is constitutional* under the present challenge. Although the 35% determination remains subject to constitutional challenge in the future, for the present, it *is* constitutional.

With that background, the question under Issue III is whether HB 1009 unconstitutionally diverts highway funds or whether it simply diverts future unclaimed funds from the motor fuel tax fund attributable to nonhighway uses. As stated in the majority opinion:

> Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakenly shown and there is no reasonable doubt that it violates fundamental constitutional principles.

(Citations omitted.) If the diversion of funds created by HB 1009 comes from the legislatively determined percentage, it properly comes from funds attributable to nonhighway uses rather than improperly from funds attributable to highway uses, which are restricted. Since AGC has failed to show beyond a reasonable doubt that the diversion comes from the highway funds, rather than from the nonhighway funds, it has not shown the diversion to be unconstitutional. Therefore, I dissent on this issue.